IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SOUTHERN DIVISION

| | |
|---|---|
| COLD SPRING HARBOR LABORATORY<br>One Bungtown Road<br>Cold Spring Harbor, New York 11724<br><br>Plaintiff,<br><br>v.<br><br>INVITROGEN CORPORATION<br>1600 Faraday Avenue<br>Carlsbad, California 92008<br><br>Defendant. | Civil Action No. _____ |

## COMPLAINT

Plaintiff, Cold Spring Harbor Laboratory ("CSHL"), for its complaint against defendant, Invitrogen Corporation ("Invitrogen"), alleges:

### NATURE OF ACTION

1. This is an action for a judgment and/or a declaration that Invitrogen is infringing U.S. Patent No. 4,851,348 ("the '348 patent"), and that Invitrogen has repudiated and/or breached its License Agreement with CSHL.

### PARTIES

2. CSHL is a non-profit corporation organized under the laws of the state of New York with its principal place of business in Cold Spring Harbor, New York.

3. Upon information and belief, defendant Invitrogen is a corporation organized under the laws of the state of Delaware with its principal place of business in Carlsbad,

California. Defendant's predecessor company, Life Technologies, Inc. ("LTI"), had its principal place of business in Gaithersburg, Maryland.

## JURISDICTION AND VENUE

4.  Count I is an action for repudiation of a contract under Delaware law. This Court has subject matter jurisdiction over Count I under 28 U.S.C. §§ 1332(a) and 1367(a).

5.  Count II is an action for patent infringement under the patent laws of the United States, 35 U.S.C. § 1 et seq. This Court has subject matter jurisdiction over Count II under 28 U.S.C. §§ 1331 and 1338(a).

6.  Count III is an action for a declaratory judgment of patent infringement under the patent laws of the United States, 35 U.S.C. § 1 et seq. This Court has subject matter jurisdiction over Count III under 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202.

7.  Count IV is an action for breach of contract under Delaware law. This Court has subject matter jurisdiction over Count IV under 28 U.S.C. §§ 1332(a) and 1367(a).

8.  Venue is proper pursuant to 28 U.S.C. §§ 1391(c) and 1400(b).

9.  On information and belief, defendant Invitrogen is registered to do business in Maryland, has appointed The Corporation Trust Inc., 300 East Lombard Street, Baltimore, MD 21202 as its resident agent in Maryland, operates a manufacturing facility in Frederick, Maryland, and sells the accused products in Maryland. In addition, LTI, who entered into the License Agreement with CSHL at issue, had its principal place of business in Gaithersburg, Maryland.

10. On information and belief, this Court has personal jurisdiction over Invitrogen.

## CSHL'S PATENT

11. The '348 patent, entitled "Biologically Pure Escherichia Coli Cell Line Which is a deoR$^-$ Mutant and Which is More Transformation Efficient With Foreign Plasmids Than deoR$^+$ Escherichia Coli Cell Lines, Processes for Obtaining These Cell Lines, Methods of Use and Transformants Thereof," was lawfully issued by the United States Patent and Trademark Office

on July 25, 1989, to CSHL. CSHL obtained right, title, and interest in the '348 patent by virtue of an assignment from the inventor Douglas Hanahan. See Exhibit A.

12. The '348 patent discloses and claims *E. coli* cell lines that are characterized as deoR⁻ mutant by more rapid growth than non-mutants on inosine containing media. The '348 patent discloses that this inosine growth assay is the method used to determine the presence of the deoR⁻ mutant.

13. A particular cell line invented by Dr. Hanahan, identified as DH-5, is the preferred embodiment of the '348 patent, and was deposited with the American Type Culture Collection ("ATCC") in connection with the patent application that issued as the '348 patent. Ex. A, col. 1, lns. 57-61.

## FACTS

### CSHL

14. CSHL is a private, non-profit basic research and educational institution located on Long Island, N.Y. Under the leadership of Dr. Bruce Stillman, a member of the National Academy of Sciences, some 300 scientists conduct groundbreaking research in cancer, neurobiology, plant genetics and bioinformatics at CSHL.

15. James D. Watson, the President of CSHL, is the co-discoverer of the famous double helix structure of DNA, one of the most profound and important scientific discoveries of all time. For this, Dr. Watson, along with Dr. Francis Crick, received the Nobel Prize in Medicine in 1962. Dr. Watson was also the Founding Director of The National Genome Sequencing Project ("The Human Genome Project"), which has and will introduce a new era in biomedical understanding and in the treatment of disease.

**License Agreement**

16. CSHL and LTI entered into a License Agreement ("the Agreement") effective on January 1, 1988. See Exhibit B. By entering into the Agreement, LTI obtained an exclusive license under CSHL's rights, know-how, technical information and patent applications for producing and selling DH-5 cells and their derivatives to the research market. In exchange for this license, LTI agreed to pay a royalty to CSHL based on sales of licensed products, due within 60 days following each calendar half year.

17. The technology that CSHL licensed to LTI under the Agreement included the technology disclosed and claimed in the '348 patent.

18. The Agreement gave either party the right to terminate the Agreement upon breach of any term upon written notice, unless the breach is cured within 60 days of the notice.

19. The Agreement required either party to immediately notify the other in writing if it determined that a third party was making, using, or selling a product within the scope of CSHL's patent rights. See Exhibit B, ¶ 7.1.

20. LTI used the licensed and patented technology from 1988 to 2000 by making and selling DH-5 cells and their derivatives to the research market. LTI's sale of these cells was authorized under the Agreement and LTI continuously paid royalties to CSHL as required by the Agreement for its use of the technology.

**Invitrogen-LTI Merger**

21. On September 14, 2000, LTI was acquired by and merged into defendant Invitrogen, with Invitrogen being the surviving entity. As part of that transaction, the Agreement was assigned to Invitrogen. CSHL and Invitrogen agreed at that time that Invitrogen would make royalty payments to CSHL on all products that had been made and sold by LTI, as well as all products made and sold by Invitrogen after the merger date, falling under the Agreement. See Exhibit C.

**The Controversy**

22. Until recently, Invitrogen paid royalties to CSHL on both its products and the former LTI products falling under the Agreement. However, Invitrogen failed to make its semi-annual royalty payment for the second half of 2002, which was due under the Agreement on March 1, 2003. The amount of the royalty payment withheld exceeds $75,000.

23. On or about March 5, 2003, Invitrogen for the first time orally informed CSHL of its contention that the cell lines it sold under license from CSHL do not infringe the '348 patent. Invitrogen told CSHL that it had sequenced its licensed cell lines and determined that they did not contain a genetic mutation in the *deoR* gene.

24. On April 3, 2003, the inventor of the '348 patent, Dr. Douglas Hanahan, asked Dr. Harry Yim of Invitrogen to provide CSHL with the scientific data and tests in support of Invitrogen's conclusion that its cell lines do not infringe the '348 patent and thus are outside the Agreement.

25. On April 10, 2003, Invitrogen provided a report to CSHL including sequence data on Invitrogen's licensed cell lines, as well as the DH-5 cell line that was deposited with the ATCC as referenced by the '348 patent specification. Neither the licensed Invitrogen cell lines nor the DH-5 cell line deposited in conjunction with the '348 patent contain, according to Invitrogen's data, a genetic mutation in the *deoR* gene.

26. After repeated attempts by Dr. Hanahan to find out from Invitrogen whether it had performed the inosine growth assay, described by the '348 patent as the method to determine the presence of a deoR⁻ mutation, on May 6, 2003 Invitrogen told CSHL: "Invitrogen has not conducted a comprehensive review of the inosine growth phenotype of its competent cells. While we realize that the inosine growth phenotype test is described in Example I of the patent, none of the claims are based on that test, and so we're puzzled as to why you are focusing on that test." Rather, Invitrogen told CSHL that "our focus was on the genotype of the strains" and that "Invitrogen's competent cells are not 'deoR⁻ mutant,' as the patent claims require."

-5-

27.     On May 22, 2003, in response to a telephone inquiry from CSHL regarding possible settlement of the dispute, Invitrogen informed CSHL that it is not interested in any settlement that involves Invitrogen making any past due or future royalty payments under the Agreement.

28.     Despite Invitrogen's stated position to CSHL, it has continued to describe its licensed cell lines as being "derived from the DH-5 strain" and as containing the "deoR mutation."

**Gene Choice v. Invitrogen**

29.     On May 16, 2002 Invitrogen informed a company called Gene Choice, Inc. ("Gene Choice") in writing that it "may be illegally using Invitrogen's intellectual property," including the '348 patent. On September 30, 2002, Invitrogen told Gene Choice in writing that "GeneChoice's use and sale of the GC5 and GC10 cells constitutes a clear infringement of U.S. Patent No. 4,851,348, to which Invitrogen owns exclusive rights."

30.     On November 12, 2002, Gene Choice sued Invitrogen in this Court for, among other things, a declaratory judgment of invalidity and non-infringement of the '348 patent. *Gene Choice, Inc. v. Invitrogen Corporation*, Civil Action No. CCB 02CV3670. On December 4, 2002, Invitrogen first provided written notice to CSHL that Gene Choice had filed the lawsuit.

31.     Under the Agreement, Invitrogen was required to immediately notify CSHL in writing if it determined that a third party was infringing the '348 patent. Invitrogen waited until after it had been sued by Gene Choice in this Court before it provided any written notice to CSHL regarding Gene Choice's infringement.

**Notice of Infringement/Breach**

32.     By written notice, sent today, CSHL has notified Invitrogen that it has breached the Agreement by withholding payment of royalties due CSHL under the Agreement and by failing to immediately notify CSHL of Invitrogen's determination that Gene Choice was infringing the '348 patent as required by the Agreement. See Exhibit D. In the written notice,

CSHL also notified Invitrogen that it is treating the Agreement as rescinded because Invitrogen by its statements and actions has repudiated the Agreement, and that Invitrogen is infringing the '348 patent because it is no longer licensed.

### COUNT I - REPUDIATION OF AGREEMENT

33. CSHL incorporates the allegations as set forth in Paragraphs 1 through 32 herein.

34. By its statement that "Invitrogen's competent cells are not 'deoR⁻ mutant,'" as the patent claims require," its withholding of royalty payments due under the Agreement, and its statement that it is not interested in any settlement of the parties' dispute that involves Invitrogen making any royalty payments, Invitrogen has indicated its refusal to perform under the Agreement.

35. Invitrogen's refusal to perform under the Agreement constitutes a repudiation of the Agreement under Delaware law.

36. Invitrogen's repudiation of the Agreement entitles CSHL to treat the contract as rescinded under Delaware law.

### COUNT II - INFRINGEMENT OF CSHL'S PATENT

37. CSHL incorporates the allegations as set forth in Paragraphs 1 through 36 herein.

38. Invitrogen is making, using, offering for sale, and/or selling cell lines encompassed by the claims of the '348 patent. Because the Agreement can be treated as rescinded as a result of Invitrogen's repudiation, Invitrogen no longer has a license under the '348 patent. Thus, Invitrogen is infringing the '348 patent.

39. On information and belief, Invitrogen is willfully infringing the '348 patent.

## COUNT III - DECLARATION OF INFRINGEMENT OF CSHL'S PATENT

40. CSHL incorporates the allegations as set forth in Paragraphs 1 through 39 herein.

41. Invitrogen is making, using, offering for sale, and/or selling cell lines encompassed by the claims of the '348 patent and by the Agreement.

42. Invitrogen has stopped paying royalties for its sales of cell lines encompassed by the claims of the '348 patent, as required under the Agreement.

43. Invitrogen's acts and statements make clear its immutable belief that its licensed cell lines do not infringe the '348 patent. In particular, Invitrogen has rejected CSHL's inquiries regarding the test disclosed by the '348 patent for identifying the deoR$^-$ mutant, the inosine growth assay, and has focused exclusively on whether its cell lines contain a genetic mutation in the *deoR* gene.

44. Invitrogen's acts and statements indicate a refusal to abide by the terms of the Agreement. In particular, Invitrogen has stated that it will not pay any past due or future royalties for its licensed cell lines as required by the Agreement. Thus, Invitrogen has made it clear that it will not cure its breach by paying the royalties due under the Agreement.

45. CSHL has provided Invitrogen with written notice that it is in breach of the Agreement.

46. There is a definite and actual controversy between the parties concerning whether Invitrogen is infringing the '348 patent.

## COUNT IV - BREACH OF CONTRACT

47. CSHL incorporates the allegations as set forth in Paragraphs 1 through 46 herein.

48. By failing to immediately notify CSHL in writing of Invitrogen's determination that Gene Choice was infringing the '348 patent, as required by the Agreement, Invitrogen has

breached the Agreement. Because this breach cannot be cured, there is no requirement that CSHL give Invitrogen 60 days to cure the breach.

## PRAYER FOR RELIEF

WHEREFORE, CSHL requests the Court to enter judgment:

A. That the Agreement is rescinded by Invitrogen's repudiation;

B. That Invitrogen is infringing the '348 patent;

C. Declaring that Invitrogen infringes the '348 patent;

D. That Invitrogen has breached the Agreement;

E. That Invitrogen's infringement of the '348 patent is willful and deliberate;

F. Awarding CSHL damages for Invitrogen's infringement;

G. Awarding CSHL damages for Invitrogen's breach of contract;

H. Enjoining Invitrogen, its officers, agents, employees, privies, successors, and assigns, and those acting in concert or participation with them, from infringing the '348 patent;

I. Declaring this case an exceptional case pursuant to 35 U.S.C. § 285 and awarding CSHL its costs, expenses, and disbursements in this action, including reasonable attorney fees; and

J. Ordering that CSHL be awarded such other and further relief as this Court deems just.

Dated: June 18, 2003                    Respectfully submitted,

*[signature]*

Charles E. Lipsey
Laura P. Masurovsky (State Bar No. 08192)
Kevin W. McCabe
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
1300 I Street, N.W.
Washington, D.C. 20005-3315
Telephone: 202-408-4000
Facsimile: 202-408-4400

Thomas W. Banks
Michael T. Siekman
55 Cambridge Parkway
Cambridge, Massachusetts 02142
Telephone: 617-425-1600
Facsimile: 617-452-1666

Attorneys for Cold Spring Harbor Laboratory